**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | | |
|---|---|---|
| JOESEPH DIBENEDETTO, | ) | |
| | ) | |
| Plaintiff, | ) | CIVIL ACTION |
| | ) | FILE NO. _____ |
| v. | ) | |
| | ) | |
| AT&T SERVICES, INC., | ) | |
| | ) | JURY TRIAL DEMANDED |
| Defendant | ) | |

## COMPLAINT

Plaintiff Joseph DiBenedetto ("Plaintiff" or "DiBenedetto") respectfully files

this Complaint against Defendant AT&T Services, Inc. ("Defendant" or "AT&T").

## INTRODUCTION

1.      This is a case of illegal age, race, and gender discrimination in the

workplace. DiBenedetto was a high-performing AT&T assistant vice president

with over two decades at the company. That was, until AT&T embarked on a

project to change the age, race, and gender composition of its leadership ranks.

Suddenly, DiBenedetto found himself lacking the assumed longevity, skin color,

and gender AT&T preferred. In fact, DiBenedetto's supervisor told him that, as a

"58-year-old white guy," it was unlikely that he would receive a promotion even

though he was qualified for it. Two months later, AT&T eliminated DiBenedetto's

position, along with at least a dozen others in his department, all of whom were white and over the age of fifty, and nearly all of whom were men.

2.      DiBenedetto brings claims under 42 U.S.C. § 1981 for race discrimination.

3.      DiBenedetto also brings claims under Title VII of the Civil Rights Act of 1964 ("Title VII"), as amended, for race, and gender discrimination.

4.      DiBenedetto also brings claims under the Age Discrimination in Employment Act ("ADEA"), for age discrimination.

## JURISDICTION, VENUE, AND PARTIES

5.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331.

6.      Pursuant to 28 U.S.C. § 1391(b), venue is proper because Defendant resides and/or conduct business in the Northern District of Georgia, and the unlawful employment practices giving rise to Plaintiff's claims occurred in this judicial district.

7.      DiBenedetto resides in the Northern District of Georgia and is a citizen of Georgia.

8.      AT&T is a for-profit corporation incorporated in Dallas, Texas. AT&T is licensed to, and does, transact business in Georgia.

9.     AT&T may be served with process via its registered agent: CT Corporation System, 289 S Culver St, Lawrenceville, GA 30046-4805.

10.     At all times material to this Complaint through DiBenedetto's last day of work with AT&T, AT&T was DiBenedetto's employer, and DiBenedetto was AT&T's employee, within the meaning of Title VII and the ADEA.

11.     At all times material to this Complaint, AT&T had more than 15 employees within the meaning of Title VII and more than 20 employees within the meaning of the ADEA.

12.     At all times material to this Complaint, AT&T had more than 500 employees within the meaning of Title VII.

## ADMINISTRATIVE PROCEEDINGS

13.     DiBenedetto filed an EEOC Charge on March 1, 2021 alleging race discrimination, age discrimination, and gender discrimination, and he made allegations before the EEOC which placed AT&T on fair notice of the Title VII and ADEA claims DiBenedetto brings in this lawsuit.

14.     DiBenedetto filed his EEOC charge within 180 days of the last act of discrimination to which he was subjected, his termination.

15.     DiBenedetto timely filed his EEOC charge.

16.     The EEOC issued a Notice of Right to Sue dated August 18, 2021.

17.     DiBenedetto has filed this lawsuit less than 90-days after his Notice of Right to Sue issued.

18.     DiBenedetto's Title VII and ADEA claims are timely filed.

19.     DiBenedetto has exhausted the administrative prerequisites to filing his Title VII and ADEA claims.

## FACTUAL ALLEGATIONS

### DiBenedetto's Position and Performance in AT&T's Finance Department

20.     DiBenedetto is a white man over the age of forty.

21.     He was born May 22, 1962 and, as of his termination giving rise to this lawsuit, he was 58 years old.

22.     DiBenedetto began his employment with AT&T as a Tax Director on October 1, 2000.

23.     AT&T promoted DiBenedetto and, by the time of his termination giving rise to this case, he held the position of Assistant Vice President ("AVP") of Tax Research and Planning in the Property Tax group.

24.     In March 2017, Gary Johnson became Vice President ("VP") Property Tax, and DiBenedetto began reporting to him.

25.     Johnson reported to Senior Vice President ("SVP") Tax Paul Stephens. SVP Tax Paul Stephens led the Tax Department. The Tax Department

included the Property Tax group as well as other Tax groups. Most or all these other Tax groups were led by VPs similar in rank to Johnson, and most or all of them included multiple AVPs (peers of DiBenedetto).

26.     The Tax Department was, in turn, a unit of the Finance Department. The Finance Department was headed by Chief Financial Officer ("CFO") John Stephens, to whom SVP Tax Paul Stephens reported. The Finance Department included the Tax Department as well as multiple other departments such as Accounting, Financial Planning & Analysis, Treasury, and External Reporting.

27.     CFO John Stephens reported to the Chief Executive Officer ("CEO"), John Stankey.

28.     DiBenedetto received consistently positive evaluations and merit-based compensation awards during his employment with AT&T.

29.     In his final performance evaluation, delivered in February 2020 and covering the year 2019, Johnson rated DiBenedetto "Meaningful Impact," meaning that DiBenedetto had met or exceeded expectations.

30.     Johnson wrote in the overall comments section that DiBenedetto was "a very talented, creative and resourceful valuation professional … [who] is clearly capable of running a successful project, which at AT&T is extremely challenging, as it typically involves several other groups outside of Tax."

31.     In his year-2018 review, conducted by his previous supervisor Elizabeth Creager, DiBenedetto received the maximum overall rating: "Extraordinary Impact."

32.     Creager wrote the following about DiBenedetto in the overall comments section of that review:

> Joe had an extraordinary year closing several planning projects that have been in progress for a few years. Joe excels at developing strategies that deliver significant property tax savings for AT&T. He effectively communicates to the team and keeps meetings action oriented by providing documents that summarize the project and the action steps necessary to complete it. He continuously brainstorms with the team to come up with innovative ideas to create additional savings for the company. Joe thank you for all your hard work and dedication.

33.     DiBenedetto not only performed his own role well, but Johnson also repeatedly asked him to take on other roles.

34.     This was consistent with Finance Department practice, which was to move and promote AVPs and other leaders into positions outside their prior experience. Johnson, for example, had little property tax experience before AT&T made him VP Property Tax. The same was true of DiBenedetto's prior supervisor, Elizabeth Creager.

35.     In 2019 and 2020, two of DiBenedetto's fellow AVPs required extended leaves from work lasting about half a year in each case. Both AVPs supervised AT&T's property tax field teams, areas of responsibility different from DiBenedetto's.

36.     Johnson selected DiBenedetto from the approximately eight available AVPs reporting to him to lead first one, and then the other, tax field team on an interim basis lasting roughly half a year in each instance.

37.     On both occasions, DiBenedetto took over his peers' duties and teams while also retaining his preexisting research and planning responsibilities.

38.     On both occasions, the field teams met or exceeded their performance goals under DiBenedetto's interim leadership.

39.     Johnson held biweekly meetings with each of his AVPs, including DiBenedetto.

40.     During his regular meetings with DiBenedetto, Johnson gave DiBenedetto consistently positive feedback.

## AT&T's Diversity and Inclusion Initiative

41.     During the last several years of DiBenedetto's employment with AT&T, the company undertook an increasingly aggressive Diversity and Inclusion ("D&I") initiative.

42.    One of the D&I goals was to intentionally alter the racial, ethnic, and gender composition of AT&T's workforce, especially at the leadership levels occupied by AVPs like DiBenedetto, to make them less white and less male on percentage bases.

43.    The D&I program was a corporate-wide program. It was overseen by AT&T's corporate-level human resources officials, and the senior leaders in each department (including Finance Department leaders like VP Gary Johnson, SVP Paul Stephens, and CFO John Stephens) were held accountable for ensuring compliance with the program within their respective units.

44.    To implement the D&I program, AT&T compiled and distributed to its business department leaders (including the Finance Department) detailed information on the racial, ethnic, and gender demographics of its workforce, including breakdowns of these demographics at different levels of the corporate and departmental hierarchies.

45.    Consistent with the D&I initiative, the Finance Department, including the Tax Department, sought to and, upon information and belief, did, beginning in at least 2018, hire new employees who were more heavily non-white, and more heavily female, than would be expected in the absence of discrimination. These newly hired employees were also predominantly younger workers, which was

8

consistent with the Tax and Finance Departments' age-based succession planning, as pled in more detail below.

46.    Consistent with the D&I initiative, the Finance Department, including the Tax Department, sought to and, upon information and belief, did, beginning in at least 2018, promote employees who were more heavily non-white, and more heavily female, than would be expected in the absence of discrimination. These newly promoted employees were also predominantly younger workers, which was consistent with the Tax and Finance Departments' age-based succession planning, as pled in more detail below.

47.    In 2020, per AT&T's response to DiBenedetto's EEOC charge, VP Gary Johnson had nine AVPs reporting to him, including DiBenedetto. All nine were white. Three were women, and six were men.

48.    The absence of non-whites and the predominance of males among the AVPs reporting to Johnson were inconsistent with the AT&T D&I goals, which emphasized making this level of leadership less white and less male.

### The AT&T Finance Department's Leaders Explicitly Made Employment Decisions about DiBenedetto and Other AVPs Based on Age, Race, and Gender

49.     Johnson frequently discussed the ages of Tax department employees under his supervision (including the AVPs) as a basis for decisions about their advancement and retention.

50.     Many of Johnson's age-related comments dealt with how much "runway" his team members (including the AVPs) had left in their AT&T careers.

51.     When Johnson used the term "runway" in reference to employees, he referred to his ageist assumption that older employees were, because of their age, closer to leaving AT&T and therefore less worth promoting or retaining than younger employees whom, Johnson assumed because of their age, would stay with AT&T longer and were therefore more worth promoting or retaining. These assumptions were based on employees' ages without regard for whether or when each employee planned to leave the company to retire, join another company, start another career, or for some other reason.

52.     Johnson and his supervisor, SVP Tax Paul Stephens, based decisions about employee termination and advancement on employees' ages, including but not limited to their ageist "runway" assumptions.

53.     One of the nine AVPs reporting to Johnson in 2020 was Gary Wiggins. Wiggins, 71 at the time, was the oldest of the AVPs under Johnson by at least five years.

54.     In mid-2020, AT&T decided to eliminate Wiggins' position.

55.     In the months before eliminating Wiggins' position, Johnson said several times that Wiggins was being selected for elimination because he had little runway left in his career. Johnson directed DiBenedetto to begin participating alongside Wiggins in Wiggins's team meetings in preparation for Wiggins' separation. During these conversations, Johnson told DiBenedetto that Wiggins was being separated because he lacked "runway."

56.     On or about July 8, 2020, Johnson told DiBenedetto that he planned to retire within the next two years. DiBenedetto said he would be interested in pursuing the VP position Johnson then held whenever Johnson left.

57.     Johnson told DiBenedetto he was qualified for the VP role and should pursue it but that he did not believe DiBenedetto would obtain the position because he was an old, white male with not enough "runway" left in his career.

58.     DiBenedetto asked Johnson to raise the subject of his potential promotion with Johnson's supervisor, SVP Tax Paul Stephens.

59.     On or about July 22, 2020, Johnson told DiBenedetto he had discussed the possibility of DiBenedetto's future promotion with SVP Tax Paul Stephens. Per Johnson, Paul Stephens wanted a departmental succession plan with people who "have a little bit more runway ahead of them."

60.     Johnson told DiBenedetto, "you could tell me you've got at least until you're 65 and, you know, is that enough runway? I don't think it is, Joe."

61.     Johnson said, "in these roles, you know, you've got to be able to adapt and move, and I'm not saying you can't, but a 58-year-old white guy, I don't know if that's going to happen."

62.     Meanwhile, AT&T had continued intensifying its D&I program.

63.     On July 27, 2020, five days after Johnson told DiBenedetto he was unpromotable because he was a "58-year-old white guy," and less than two months before DiBenedetto's subsequent elimination, CFO John Stephens sent an email entitled "More work to do in Finance."

64.     CFO John Stephens' memo was addressed to the entire US-based Finance Department, which he led, and of which Tax, under VP Tax Paul Stephens, was just one of several departments.

65.     CFO John Stephens' email referenced statements made earlier that same day by CEO John Stankey about AT&T's race, ethnicity, and gender

demographics. John Stephens's email included bar graphs and charts showing the race, ethnicity, and gender composition of the Finance Department and breakdowns of these demographics by non-management positions, management positions, and senior leadership positions.  The email stated, "Our demographics demonstrate that we must focus more on attracting and retaining diverse employees throughout our organization, especially at our senior levels."

66.     DiBenedetto occupied a senior level. So did Wiggins.

**Less Than Two Months After Telling DiBenedetto He Could Not
Advance because he is "a 58-year-old white guy," Johnson Told
DiBenedetto his Position was Eliminated**

67.     On or about September 17, 2020, Johnson told DiBenedetto his position was being eliminated.

68.     Johnson told DiBenedetto the decision was not performance related. The decision was, per Johnson, numbers related. When Johnson referred to the decision being "numbers related," he was referring the financial performance of the company.

69.     About a week later, Johnson reiterated to DiBenedetto that the decision to eliminate his position was not performance related.

70.     On or about October 5, 2020, DiBenedetto spoke with VP Tax Paul Stephens, who also confirmed that the decision to eliminate DiBenedetto's position

13

was not performance related but instead was allegedly because the business was struggling.

71.     VP Tax Paul Stephens told DiBenedetto the plan to eliminate DiBenedetto's position had been approved by CFO Stephens and CEO John Stankey.

72.     On or about October 8, 2020, while DiBenedetto remained employed with AT&T before the effective date of his elimination, AT&T's Controller, Debbie Dial, and its Senior Vice President of Human Resource Operations, Scott Smith, led a webcast attended by the Finance Department's managers. Their subject was the company's ongoing ("D&I") initiative.

73.     During that webcast, Smith referenced having sent demographic data on AT&T's workforce to the company's senior leaders. He stated that the company had been formulating D&I operating plans for which leaders would be accountable. He also stated AT&T would conduct quarterly D&I operations reviews.

74.     Per the webcast, many of these initiatives were things the company had already been doing, but recently the company was doubling down on its D&I efforts.

75.     Dial and Smith indicated that the D&I effort emphasized the director level of the company. This was the level that included AVPs.

76.     At or about the same time as the October 8, 2020 D&I presentation by Dial and Smith, CEO John Stankey gave an internal webcast on the company's performance for the third quarter of 2020, which had just concluded.

77.     Stankey reported that the company had had a solid third quarter, citing multiple business performance metrics in support of his positive assessment. Stankey's webcast was preceded by an email whose subject line read, "Thumbs up! Q3 earnings recap in less than 3 minutes" and stated, "We announced strong third-quarter results this morning…." This was about three days after VP Tax Paul Stephens told DiBenedetto his position was eliminated because the company was struggling.

78.     On November 2, 2020, DiBenedetto worked his last day with AT&T, concluding his two-decade career with the company.

79.     The separation papers AT&T provided DiBenedetto told him he should look for a new job outside the company rather than search internally.

80.     At or about the same time as DiBenedetto's elimination, the Tax Department eliminated at least a dozen other individuals. Upon information and belief, approximately nine of them were male; all were white, and all were over the

15

age of fifty. Indeed, in connection with informing DiBenedetto of his own separation, VP Tax Paul Stephens and SVP John Stephens both told him that the job eliminations were not limited to Tax but rather were made throughout the entire Finance Department.

81.    In connection with his elimination, AT&T sent DiBenedetto a document entitled "ADEA Listing" which identified the "Decisional Unit" AT&T deemed eligible for job elimination as "AVP positions responsible for property tax negotiations and property tax research and planning that report to VP, Gary Johnson."

82.    "AVP positions responsible for property tax negotiations and property tax research and planning that report to VP, Gary Johnson" was not a business or decisional unit of AT&T.

83.    Rather, this purported "Decisional Unit" referred specifically to three of the nine AVPs reporting to VP Property Tax Johnson; all three were male, and AT&T eliminated two of these three.

84.    Had AT&T eliminated any of Johnson's three female AVPs, this would have been inconsistent with AT&T's D&I goals.

85.     By eliminating two male AVPs, AT&T made the AVP team reporting to Johnson substantially closer to equal male-female representation, which was consistent with the D&I goals.

86.     Within less than a year after these claimed job eliminations, the Tax Department materially re-created one of the Director-level positions it had eliminated and filled it with a female employee roughly ten years younger than the previous incumbent woman it had eliminated.

87.     AT&T, including its managerial and human resources officials involved in the above-pled facts, knew throughout DiBenedetto's employment that it was a violation of DiBenedetto's federal rights to discriminate against DiBenedetto based on his race, gender, or age, or to terminate him because of his race, gender, and age.

88.     Specifically, but without limitation: the individuals responsible making and approving the decision to eliminate DiBenedetto, including VP Johnson, SVP Paul Stephens, CFO John Stephens, and CEO John Stankey, knew it was illegal to terminate DiBenedetto because of his race, gender, or age via training they had received on federal employee rights laws throughout their AT&T careers, and based on their own knowledge and experience.

89.     AT&T, including its managerial and human resources officials involved in the above-pled facts, acted with malice toward DiBenedetto.

90.     Additionally and in the alternative, AT&T, including its managerial and human resources officials involved in the above-pled facts, acted with reckless disregard for DiBenedetto's federally protected rights.

## COUNT I
## INTENTIONAL RACE DISCRIMINATION IN VIOLATION OF 42 U.S.C. § 1981

91.     Plaintiff incorporates by reference all preceding paragraphs of the Complaint.

92.     At all times material to this Complaint, DiBenedetto and Defendant were parties to an oral contract of employment under which, *inter alia*, DiBenedetto worked for Defendant and Defendant compensated DiBenedetto for his work.

93.     DiBenedetto performed his contractual obligations by, *inter alia*, working for Defendant.

94.     Under 42 U.S.C. § 1981, it is unlawful for Defendant to discriminate against DiBenedetto based on his race in the making or enforcement of contracts with him.

95.     42 U.S.C. § 1981's prohibition on race discrimination in the making or enforcing of contracts applies to DiBenedetto's employment contract with Defendant.

96.     The above-pled facts constitute race discrimination in violation of 42 U.S.C. § 1981 because Defendant discriminated against DiBenedetto by terminating his employment because of his race.

97.     Defendant's intentionally discriminatory actions caused DiBenedetto to suffer lost compensation and other benefits of employment, garden variety emotional distress, inconvenience, humiliation, and other indignities.

98.     DiBenedetto is entitled to damages, including back pay and lost benefits, front pay and/or reinstatement, compensatory damages, punitive damages, attorneys' fees, and costs of litigation pursuant to 42 U.S.C. § 1988, and all other relief recoverable under 42 U.S.C. § 1981.

99.     Defendant acted with malice toward DiBenedetto, authorizing an award of punitive damages.

100.     Additionally and in the alternative, Defendant acted with reckless disregard for DiBenedetto's federally protected rights, authorizing an award of punitive damages.

## COUNT II
## RACE DISCRIMINATION IN VIOLATION OF TITLE VII

101.     Plaintiff incorporates by reference all preceding paragraphs of this Complaint.

102.     At all times material to this Complaint, DiBenedetto was Defendant's employee, and Defendant was DiBenedetto's employer, within the meaning of Title VII.

103.     At all times material to this Complaint, Defendant had more than 500 employees.

104.     Defendant violated DiBenedetto's rights under Title VII by terminating DiBenedetto because of his race.

105.     Defendant undertook the above-pled conduct, including terminating DiBenedetto, because of DiBenedetto's race in violation of Title VII's anti-discrimination provisions.

106.     Defendant's conduct caused DiBenedetto to suffer damages, including lost wages and benefits, garden variety emotional distress, inconvenience, humiliation, and other indignities.

107.     Defendant acted with malice toward DiBenedetto, authorizing an award of punitive damages.

108.     Additionally and in the alternative, Defendant acted with reckless disregard for DiBenedetto's federally protected rights, authorizing an award of punitive damages.

## COUNT III
## AGE DISCRIMINATION IN VIOLAITON OF THE ADEA

109.     Plaintiff incorporates by reference all preceding paragraphs of this Complaint.

110.     At all times material to this Complaint, Defendant was an "employer" within the meaning of 29 U.S.C. § 630(b).

111.     At all times material to this Complaint, Defendant had more than 20 employees.

112.     Under the ADEA, it is illegal for Defendant to terminate an individual because of that individual's age. 29 U.S.C. § 623(a).

113.     Defendant discriminated against DiBenedetto by terminating him because of his age, in violation of the ADEA.

114.     Defendant's discriminatory actions have caused DiBenedetto damages including, but not limited to, lost wages and benefits.

115.     Defendant's discriminatory acts were willful within the meaning of the ADEA.

116.     DiBenedetto is entitled to liquidated damages under 29 U.S.C. § 626(b).

## COUNT IV
## GENDER DISCRIMINATION IN VIOLATION OF TITLE VII

117.     Plaintiff incorporates by reference all preceding paragraphs of this Complaint.

118.     At all times material to this Complaint, DiBenedetto was Defendant's employee, and Defendant was DiBenedetto's employer, within the meaning of Title VII.

119.     At all times material to this Complaint, Defendant had more than 500 employees.

120.     Defendant violated DiBenedetto's rights under Title VII by terminating DiBenedetto because of his gender.

121.     Defendant undertook the above-pled conduct because of DiBenedetto's gender in violation of Title VII's anti-discrimination provisions.

122.     Defendant's conduct caused DiBenedetto to suffer damages, including lost wages and benefits, garden variety emotional distress, inconvenience, humiliation, and other indignities.

123.     Defendant acted with malice toward DiBenedetto, authorizing an award of punitive damages.

124.     Additionally and in the alternative, Defendant acted with reckless disregard for DiBenedetto's federally protected rights, authorizing an award of punitive damages.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands a TRIAL BY JURY and the following relief:

(a)     Declaratory judgment that Defendant violated Plaintiff's rights under the federal statutes listed above;

(b)     A permanent injunction against Defendant enjoining Defendant from further violations of the federal statutes listed above;

(c)     Full back pay from the date of Plaintiff's termination, including all raises to which Plaintiff would have been entitled but for his unlawful termination, and all fringe and pension benefits of employment, with prejudgment interest thereon;

(d)     Reinstatement to Plaintiff's former position with Defendant, or in the alternative, front pay to compensate Plaintiff for lost future wages, benefits, and pension;

(e)     Liquidated damages pursuant to the ADEA;

(f)     Compensatory damages, in an amount to be determined by the enlightened conscience of the jury, for Plaintiff's garden variety emotional distress, suffering, inconvenience, mental anguish, loss of enjoyment of life and special damages;

(g)     Punitive damages in an amount to be determined by the enlightened conscious of the jury to be sufficient to punish Defendant for its conduct toward Plaintiff and deter Defendant from similar conduct in the future;

(h)     Reasonable attorneys' fees and cost; and

(i)     Other and further relief as the Court deems just and proper.

**PLAINTIFF DEMANDS A TRIAL BY JURY ON ALL ISSUES SO TRIABLE.**

Respectfully submitted November 2, 2021.

_s/ Steven E. Wolfe_
Steven E. Wolfe
Georgia Bar No. 142441
Marissa R. Torgerson
Georgia Bar No. 848356

LEGARE, ATTWOOD & WOLFE, LLC
125 Clairemont Avenue, Suite 380
Decatur, GA  30030
Telephone: (470) 823-4000
Facsimile: (470) 201-1212

sewolfe@law-llc.com
mrtorgerson@law-llc.com

Counsel for Plaintiff