**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | | |
|---|---|---|
| JOSEPH DIBENEDETTO, | ) | CIVIL ACTION |
| | ) | FILE NO. 1:21-cv-04527-MHC-RDC |
| Plaintiff | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| AT&T SERVICES, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## PLAINTIFF'S RESPONSE TO DEFENDANT AT&T SERVICES, INC.'S MOTION TO DISMISS

## I.    INTRODUCTION AND SUMMARY OF THE FACTS

### A.    The Issues Before the Court

This is a case of age, race, and gender discrimination under the ADEA, 42 U.S.C. § 1981, and Title VII. The case is before the Court on AT&T's motion to dismiss. The motion is meritless, and the Court should deny it in its entirety.

AT&T makes two arguments. First, it claims the Court should dismiss the 42 U.S.C. § 1981 and ADEA claims. According to AT&T, these statutes require DiBenedetto to prove either race (under 1981) or age (under the ADEA) was the *sole* cause of his termination, and since DiBenedetto claims he was terminated because of his race, age, and gender, he cannot prove any of them was the sole cause. This is frivolous to the point of bad faith. AT&T's position is contrary to a Supreme Court

decision directly on point, *Bostock v. Clayton Cty.,* 140 S. Ct. 1731, 1744 (2020), and it relies on multiple cases that have been overruled.

Second, AT&T claims the Court should dismiss DiBenedetto's Title VII race and gender claims because he did not plead enough factual detail to state plausible claims. This, too, is meritless. AT&T ignores Rule 8's pleading standard, ignores most of DiBenedetto's allegations, and badly mischaracterizes its CFO's email about the company's Diversity and Inclusion plan ("DIP").

### B.    Factual Summary[1]

 DiBenedetto is a white man, and he was 58-years old when AT&T terminated him after twenty years' service to the company. (Doc. 1¶20-22). DiBenedetto's supervisors gave him consistently strong performance reviews, relied on him to carry extra responsibilities, and promoted him to Assistant Vice President (AVP) in the Tax group. (Id. ¶23-40). On September 17, 2020, AT&T eliminated DiBenedetto's position, ostensibly as part of a reduction in force ("RIF"). (Id. ¶67-71).

In July 2020, just two months before his elimination, DiBenedetto met with his supervisor, Property Tax VP Gary Johnson, about a potential promotion. (Id.

---

[1] DiBenedetto's Complaint is 124 paragraphs, including 70 paragraphs of factual allegations (Doc. 1). Rather than recite those allegations in full, DiBenedetto incorporates them by reference, highlighting key facts, and relying on the entire Complaint in support of his brief.

¶56-57). Johnson told DiBenedetto he would not likely get the promotion because he was an old, white male with not enough "runway" left in his career. (Id. ¶56-57). When DiBenedetto challenged this, Johnson met with his own supervisor, Tax VP Paul Stephens, and then confirmed to DiBenedetto that Stephens' succession plan favored people with more "runway" left in their career, adding, "in these roles…you've got to be able to adapt and move, and I'm not saying you can't, but a 58-year-old white guy, I don't know if that's going to happen." (Id. ¶58-60).

Johnson's comments were consistent with the Tax Department's age-based retention and promotion scheme. (Id. ¶52, 58-61). Johnson frequently commented about employees' ages as a basis for promotion and retention decisions. (Id. ¶49). He particularly focused his comments on how much "runway" employees had left, meaning, his assumption that older employees were, because of their age, closer to leaving AT&T and therefore less worth promoting or retaining than younger employees whom, Johnson assumed because of their age, would stay with AT&T longer and were therefore more worth promoting or retaining – assumptions Johnson made without regard for whether or when employees planned to retire or leave for other reasons. (Id. ¶51). In mid-2020, about three months before eliminating DiBenedetto, Johnson explicitly told DiBenedetto he was eliminating AVP Gary Wiggins, who as 71 at the time, because Wiggins lacked "runway." (Id. ¶53-55).

3

Johnson's statements were also consistent with AT&T's increasingly aggressive, corporate-wide DIP. The DIP's goals were to retain existing women and non-white leaders and to make AT&T's workforce, especially the leadership levels occupied by AVPs like DiBenedetto, less white and less male. (Id. ¶42; Doc. 4-3, p.6).[2] AT&T gave its leaders detailed workforce demographic information, and it held them accountable for complying with the DIP goals. (Id. 42-44). Well before eliminating DiBenedetto, the Finance Department had already begun disproportionately hiring women and non-whites. (Doc. 1, ¶45-46).

Amidst the Tax department's age-based personnel planning and the company-wide DIP, AT&T conducted a (RIF) and, as part of this ostensible cost-cutting measure, it eliminated DiBenedetto's position. (Id. ¶67-71). At the same time, the Tax Department eliminated at least a dozen other employees, of whom nine were male, all were white, and all were over 50 years old. (Id. ¶80).

---

[2] DiBenedetto does not object to the Court relying on Doc. 4-3 (CFO Stephens' email) and agrees with AT&T that the Court should do so under the 12(b)(6) pleading standard rather than converting the motion to Rule 56 motion. AT&T also submits DiBenedetto's EEOC charge, and DiBenedetto again agrees with AT&T that the Rule 12(b)(6) standard is not altered by that submission, though the Charge is irrelevant.

## II.     ARGUMENT

### A.     The 1981 and ADEA Claims

AT&T's argument against the 1981 and ADEA claims runs like this: both claims require DiBenedetto to prove he was fired because of his race (1981) or age (ADEA); to prove he was fired because of his race/age, he must prove but for causation; but for causation means sole causation; DiBenedetto alleges age, race, and gender all caused his termination; therefore DiBenedetto cannot prove either race or age was the sole cause of his termination, so both his 1981 and his ADEA claims should be dismissed. (Doc. 4-1, p.9, 11).

AT&T's argument is frivolous. But for cause does not mean sole cause and, even at trial, DiBenedetto need only show his race/age was one of multiple factors that caused his termination. *Bostock,* 140 S. Ct. at 1739.

> ***Often, events have multiple but-for causes*** …. When it comes to Title VII, the adoption of the traditional but-for causation standard means a defendant cannot avoid liability just by citing some other factor that contributed to its challenged employment decision. So long as the plaintiff's sex was ***one*** but-for cause of that decision, that is enough to trigger the law.

*Bostock*, 140 S. Ct. 1731, 1739 (2020) (emphasis added). To satisfy but for cause, "the plaintiff's sex need not be the sole or primary cause of the employer's adverse action." *Id.* at 1744.

5

*Bostock*'s definition of but for cause applies with full force to DiBenedetto's Section 1981 and ADEA claims even though *Bostock* was decided under Title VII. The *Bostock* Court found that, despite the availability of Title VII's "more forgiving" motivating factor causation standard under 42 U.S.C. § 2000(e)(2)(m), the opinion rested on ordinary, traditional but for causation and not on motivating factor causation. *Id.* at 1740. So, there is no question the Court was defining and relying on but for cause, not motivating factor cause.

The text of the ADEA and Title VII also show that but for cause means the same for the ADEA as *Bostock* held it means for Title VII. The causation language *Bostock* interpreted under Title VII is identical to the ADEA's causation language. *See* 42 U.S.C. §2000e-2(a)(1) ("It shall be an unlawful employment practice for an employer…to discharge any individual…because of such individual's race [or] sex….") *and* 29 U.S.C. § 623(a)(1) ("It shall be unlawful for an employer…to discharge…any individual…because of such individual's age").[3] At least one district court has heard the argument that *Bostock* does not apply to the ADEA, and it held, "This argument crashes, Wile E. Coyote-esque, into veritable mountains of contrary

---

[3] The *Bostock* Court relied on Title VII's "because of" language, noting that Congress could have, but did not, modify "because of" with words like "solely" or "primarily." Id. at 1739. Just like Title VII, Section 1981 and the ADEA lack words like "solely" or "primarily."

precedent. The Supreme Court has made clear that, 'Often, events have multiple but-for causes.'" *Keller v. Hyundai Motor Mfg*., 513 F. Supp. 3d 1324, 1330 (M.D. Ala. 2021) (citing *Bostock*, 140 S.Ct. 1739).

While Section 1981 does not use the phrase "because of," AT&T says (rightly) that 1981 and the ADEA follow the same but for causation standard. (Doc. 4-1, p.11). In fact, AT&T cites *Comcast Corp. v Nat'l Ass'n. of Afr. Am-Owned Media*, 140 S. Ct. 1009, 1014 (2020), a 1981 case, as requiring but for cause under both statutes. (Doc. 4-1, p.8, 11). Since *Bostock* plainly applies to both Title VII and the ADEA, and the parties agree the ADEA and 1981 have the same causation standard, *Bostock* provides the meaning of but for cause under 1981 as well.[4]

---

[4]     AT&T not only argues contrary to *Bostock*; it does not even cite the case. These are brazen positions, and there is no plausible way AT&T missed the *Bostock* case when preparing its brief. For example, the *Bostock* Court found it had "previously explained, 'the ordinary meaning of 'because of' is 'by reason of' or 'on account of,'" citing its earlier decision in *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167 (2009). *Gross* is an ADEA case which AT&T cites four times in its brief. (Doc. 4-1, p.10, 11, 12, 13). As of the morning of January 18, 2022, when this brief was filed, *Gross* appears on Lexis with a yellow flag indicating "possible negative treatment" and, when the case is shepardized, *Bostock* is the first result. Ex. A.

Additionally, the day the Supreme Court issued the *Bostock* decision, AT&T's counsel posted a "Legal Alert" on their website authored by five of the firm's lawyers, including the Team Leader of its Labor and Employment Practice (though not by the attorneys who have appeared in this case). The "Legal Alert" describes *Bostock* as a "landmark decision" and states: "the Court addressed the traditional 'but-for' analysis regarding causation and was clear that '[w]hen it comes to Title VII, … a defendant cannot avoid liability just by citing some other factor that

Even before *Bostock*, all but a few cases held that but for cause did not require sole causation. *See*, *e.g., Kingsley v. Tellworks Communs*., 2017 U.S. Dist. LEXIS 92619, *93-94 (N.D. Ga. May 24, 2017) (but for cause does not mean sole cause, and plaintiff's admission that defendant may have had multiple reasons for the adverse action did not defeat the claim); *Evanston Ins. Co. v. Sandersville R.R. Co*., 2016 U.S. Dist. LEXIS 134162 at *29-30 (M.D. Ga. Sept. 29, 2016) ("But-for causation does not mean sole causation, i.e., 'standing alone'."); *McDowell v. Massey Auto*, 2017 U.S. Dist. LEXIS 74373 (M.D. Ala. May 15, 2017) (plaintiff did not have to prove age was sole motivating factor; rather, a but-for reason).

AT&T has no good authority for its position. It relies most heavily on *Comcast Corp.*, 140 S. Ct. 1009, which held Section 1981 requires but for causation. *Id.* at 1014. But the issue here is not whether but for cause is required; it is what but for cause means, and on that issue, *Bostock* controls. The *Comcast* Court did not hold but for cause means sole cause. The issue in *Comcast* was only whether Section 1981's causation standard was but for or motivating factor, and the Court declined to rule whether the plaintiff met the but for cause standard. *Comcast,* 140 S.Ct. 1019.

---

contributed to its challenged employment decision. So long as the plaintiff's sex was one but-for cause of that decision, that is enough to trigger the law.'" https://kilpatricktownsend.com/en/Insights/Alert/2020/6/Discrimination-Against-Gay-and-Transgender-Employees-Unlawful-Under-Title-VII.

*Bostock*, on the other hand, rests expressly on what but for cause means and what the plaintiff must show to meet that standard. *Supra*.[5]

AT&T's other citations are even less help. *Piccioli v. Plumbers Welfare Fund Local 130, U.A.,* No. 19-cv-00586, 2020 U.S. Dist. LEXIS 190576 (N.D. Ill. Oct. 14, 2020) defines but for causation to mean "***the*** determining factor." 2020 U.S. Dist. LEXIS 190576, *17 (emphasis added). But *Piccioli* mis-cites *Miller v. Am. Airlines, Inc.*, 525 F.3d 520, 523 (7th Cir. 2008), which holds: "The plaintiffs do not have to show . . . that their age was the sole motivation for the employer's decision; it is sufficient if age was *a* 'determining factor' or a 'but for' element in the decision." 525 F.3d 523 (emphasis added). No matter how much AT&T might wish it, a district court cannot overrule its circuit court.

*Culver v. Birmingham Bd. of Educ.* held that *Gross* required plaintiffs to prove age caused their termination to the exclusion of other motives. 646 F.Supp.2d 1270, 1271-72 (N.D. Ala. 2009) (Acker, J.). That holding is bad law under *Bostock.* But *Culver* was bad law even ***before*** *Bostock.* In *Savage v. Secure First Credit Union*, 107 F. Supp. 3d 1212, 1213 (N.D. Ala. 2015) (Acker, J.), the same Judge again found

---

[5] Additionally, the Supreme Court decided *Bostock* June 15, 2020, ***after*** it decided *Comcast* on March 23, 2020. Justice Gorsuch wrote the majority opinion in both decisions, with Chief Justice Roberts and Justices Breyer, Sotomayor, and Kagan joining him in both opinions.

that but for cause means sole cause, and further, that the plaintiff's ADEA claim must be dismissed because the plaintiff pled multiple claims, thereby admitting there were multiple causes. *Id.* at 1213. This is almost exactly AT&T's position. The Eleventh Circuit reversed because Fed. R. Civ. P. 8 permits plaintiffs to plead multiple inconsistent claims in the alternative. *Savage v. Secure First Credit Union*, No. 15-12704, 2016 U.S. App. LEXIS 9530, at *1 (11th Cir. May 25, 2016). Thus, even if AT&T were right that but for cause means sole cause, its motion would ***still*** be meritless because Rule 8 would still allow multiple, alternative but for cause claims. Along with omitting *Bostock,* AT&T's brief never mentions *Savage*.

*Whitaker v. Tenn. Valley Auth. Bd. of Directors,* holding that but for cause means sole cause under *Gross*, is also no good for AT&T. 2010 U.S. Dist. LEXIS 37177 (M.D. Tenn. Apr. 14, 2010). Like *Culver*, this is bad law after *Bostock.* And, like *Culver, Whitaker* was also bad law before *Bostock.* Two years after *Whitaker*, the Sixth Circuit, sitting *en banc* and relying on *Gross*, held that but for causation applies to the ADA and held it was error to instruct a jury that the ADA required the plaintiff to prove sole cause. *Lewis v. Humboldt Acquisition Corp*., 681 F.3d 312, 318 (6th Cir. 2012). The Middle District of Tennessee later recognized that *Lewis* overruled *Whitaker. Newcomb v. Allergy & ENT Assocs. of Middle Tenn*., P.C., No.

3:10-cv-1230, 2013 U.S. Dist. LEXIS 63377, at *34 (M.D. Tenn. May 3, 2013). AT&T does not mention this either.[6]

In sum, AT&T's position is meritless to the point of bad faith. It also yields deeply cynical, perverse results. Under the AT&T rule, racist decisions are illegal; sexist decisions are illegal; but racist, sexist decisions are just fine. This is quite a contention from an employer that champions diversity and inclusion. Every child knows two wrongs don't make a right. The Supreme Court and the Eleventh Circuit know it, too. This Court should teach AT&T the same lesson.

### B.    The Title VII Claims

AT&T's only argument for dismissing DiBenedetto's Title VII race and gender claims is that Complaint does not allege enough facts to plausibly support them. (Doc. 4-1, p.1, 12-13). The Court may quickly dispose of this. AT&T applies the wrong pleading standard, ignores large portions of the Complaint's allegations, and misrepresents the allegations it has cherry-picked for its brief.

---

[6] *McFadden v. Krause*, 357 Fed. Appx. 17, 19 (9th Cir. 2009) is an unpublished Ninth Circuit decision. It is a summary judgment decision, not a 12(b)(6) case. *McFadden*, 357 Fed. Appx. at 19. It does not hold that but for cause means sole cause. *Id.* And, to the extent it could be so read, it is clearly bad law under *Bostock*, probably incompatible with the Eleventh Circuit's holding in *Savage* and regardless, obviously not binding.

1.      **The Rule Pleading and Motion to Dismiss Standards**

The Federal Rules require only "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). A complaint need only "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "The plausibility standard is not akin to a 'probability requirement....'" *Id.*

Consistent with these pleading rules, an employment discrimination plaintiff need not even allege facts sufficient to make out the classic *McDonnell Douglas prima facie* case. *Gomez v. City of Doral*, 2022 U.S. App. LEXIS 85, *5 (11th Cir. Jan. 3, 2022). He certainly "need not prove [his] case on the pleadings." *Gomez*, 2022 U.S. App. LEXIS 85 at *5 (quoting *Speaker v. United States HHS CDC & Prevention*, 623 F.3d 1371, 1386 (11th Cir. 2010)).[7]

---

[7] This case could not be more different than *Thornton v. Albany Drivers License*, 2012 U.S. Dist. LEXIS 108300, *10 (M.D. Ga. Aug. 2, 2012) where the plaintiff merely alleged that the receipt of a denial letter one day after he submitted his application with no other factual allegations or than *Jackson v. BellSouth Telecomms.*, 372 F.3d 1250, 1274 911th Cir. 2004) where "plaintiff's charges [were] wholly conclusory, generalized, and non-specific claims of disparate treatment."

In a transparent effort to impose a higher standard than Rules 8 and 12 require, AT&T repeatedly cites cases decided under the more intensive Rule 56 summary judgment standard – a standard that applies after the plaintiff has conducted discovery. *See*, *Daniels v. Westinghouse Elec. Corp.*, 772 F. Supp. 1278, 1281 (N.D. Ga. 1990) (decided at summary judgment, applying *McDonnell Douglas*); *Nealy v. SunTrust Bank*, 2021 U.S. App. LEXIS 32769 (11th Cir. Nov. 3, 2021) (same); *compare*, *Gomez*, 2022 U.S. App. LEXIS 85 at *5.

### 2.     DiBenedetto's Title VII Claims Meet the Standard

After urging an incorrect pleading standard, AT&T claims DiBenedetto fails that standard by ignoring most of his allegations, focusing on isolated allegations taken out of context, and misrepresenting its CFO's email about the DIP. But the question before the Court is not whether selected bits of the Complaint, in isolation "demonstrate that AT&T…eliminated Plaintiff's position because of [his race or gender]" (Doc. 4-1, p.17). It is whether all the factual allegations read together and taken in DiBenedetto's favor raise a plausible inference that AT&T did so. *Gomez*, 2022 U.S. App. LEXIS 85 at *6. The answer to that correct question is "yes."

DiBenedetto alleged he was eliminated during a RIF conducted during AT&T's "increasingly aggressive [DIP]," whose goal was to intentionally alter the racial, ethnic, and gender composition of AT&T's workforce, especially at the

13

leadership levels occupied by AVPs like DiBenedetto to make them less white and less male on percentage bases. (Doc. 1, ¶41-42, 45, 62, 65, 74-75). DiBenedetto's supervisor, Johnson, expressly told him his race and gender were barriers to advancement just two months before he told DiBenedetto he was eliminated. (Doc. 1, ¶¶57, 61). Within Johnson's Tax Group, the RIF overwhelmingly eliminated whites and men (Doc. 1, ¶80). The only AVPs under Johnson whom AT&T eliminated were DiBenedetto and a white male colleague. To accomplish this, AT&T fabricated a "Decisional Unit" comprising only three specific white, male AVPs and excluding all three female AVPs, and then it eliminated 2/3 of the fictitious "unit." (Doc. 1, ¶81-84). Not only was the RIF process discriminatory, it is plausible there was never a legitimate reason for the RIF: Johnson and Paul Stephens told DiBenedetto he was eliminated "because the business was struggling," but three weeks later, the CEO "announced strong third-quarter results." (Doc. 1, ¶67-71, 77). Taken together, these allegations, along with the rest of the Complaint, "amount to 'enough circumstantial evidence to raise a reasonable inference of intentional discrimination,'" so the Complaint must survive a motion to dismiss. *Latimore v. City of N. Miami Beach*, 2021 U.S. Dist. LEXIS 195094, *12-13 (S.D. Fla. Oct. 8, 2021) (quoting *Hamilton v. Southland Christian Sch., Inc.*, 680 F.3d

14

1316, 1320 (11th Cir. 2012)). Nevertheless, DiBenedetto addresses AT&T's selective attacks on his pleading below.

      **i.**    **Johnson's Comments**

AT&T claims that when Johnson told DiBenedetto he would not likely be promoted because he was "a 58-year-old white guy," and an "old white male," Johnson merely voiced "theoretical … opinions." (Doc. 4-1, p.14). AT&T also claims that, even if Johnson had race and gender animus toward DiBenedetto, there is no plausible claim that AT&T eliminated DiBenedetto for those reasons because the department was overwhelmingly white and male such that the RIF necessarily impacted mostly white men. (Id., p.15). At trial, AT&T's claims would strain credulity; at the 12(b)(6) stage where the Court must take all the facts as true and draw all plausible influences in DiBenedetto's favor, they are complete nonstarters.

First, the pleading supports a valid inference that Johnson's comments were not theoretical opinions but Johnson's truthful, factual assessment that DiBenedetto's race and gender were career obstacles at AT&T. On July 8, 2020, Johnson told DiBenedetto he did not think DiBenedetto would be promoted because he was an old, *white man*. (Doc. 1, ¶57) (emphasis added). At DiBenedetto's urging, Johnson discussed DiBenedetto's promotability with Senior VP Tax Paul Stephens, and then confirmed to DiBenedetto on July 22, 2020 that, as "a 58-year-old *white*

*guy*," DiBenedetto was unlikely to obtain promotion. (Id. ¶61) (emphasis added). At the time Johnson made these comments, he and Paul Stephens were under DIP directives to increase non-male and non-white representation in their senior ranks (Id. ¶41-44). And they had already been following those directives by hiring and promoting disproportionate numbers of non-male and non-white employees. (Id. ¶44-45). These facts support a credible inference that Johnson's comments reflected his truthful determination, confirmed by Paul Stephens, that DiBenedetto's race and gender were barriers to advancement because of AT&T's directives to promote and retain more non-whites and women in senior leadership. Johnson will have the opportunity to explain his meaning in his deposition; Rule 12(b)(6) does not permit the Court to hold as a matter of law that Johnson was only speaking "theoretically."

Second, the comments and other facts support a plausible inference that AT&T terminated DiBenedetto because of his race and gender. *Goble v. City of Smyrna*, 248 F. Supp. 3d 1351, 1379 (N.D.Ga. 2017) ("A plaintiff also can demonstrate pretext by showing that the decision maker made discriminatory remarks"). Johnson made the above comments to DiBenedetto just two months before telling DiBenedetto he was eliminated. (Doc. 1, ¶56-61). AT&T's RIF decisions affecting Johnson's nine AVPs were consistent with the DIP and Johnson's statements: prior to the eliminations, Johnson had three women and six

men AVPs reporting to him. (Id. ¶47). By creating a fictious RIF "Decisional Unit" that included three specific male AVPs and excluded all three women AVPs, AT&T guaranteed it would retain all women AVPs under Johnson (an explicit D&I goal per Doc. 4-3), and by eliminating two of the three male AVPs in the fabricated "Decisional Unit," AT&T shifted the gender composition of Johnson's AVP team from six men, three women, to four men, three women, thereby furthering another D&I goal. (Doc. 1, ¶81-85).[8] In fact, CEO Stankey's announcement of strong third quarter business performance, just after AT&T told DiBenedetto he was eliminated because the company was struggling, supports an inference that there was no business justification for the RIF, and that AT&T conducted it to clear whites and men out of leadership positions in furtherance of the DIP. (Id. ¶76-77).

Finally, AT&T claims DiBenedetto cannot link Johnson's race and gender comments to his elimination because, his peers being overwhelmingly white men, the RIF necessarily impacted those groups. (Doc. 4-1, p.15). But AT&T misses the point. DiBenedetto claims AT&T conducted the RIF as it did precisely ***because*** the senior managers were mostly white men. (Doc. 1, ¶41-42, 45, 62, 65, 74-75).

---

[8] As shown further below, even though all nine of Johnson's AVPs were white, eliminating two of them advanced the DIP goal of decreasing white leadership representation. There are finite AVP positions in the broader Finance and corporate organizations, and two fewer whites in that finite group necessarily means the remaining non-whites comprise a higher percentage of the overall leadership.

Regardless, AT&T cannot defeat DiBenedetto's claim that *he* was terminated because he is a white man by showing it did not fire other white men. *Conn. v. Teal*, 457 U.S. 440, 454-55 (1982) ("Congress never intended to give an employer license to discriminate against some employees on the basis of …sex merely because he favorably treats other members of the employees' group"); *Bostock*, 140 S.Ct. at 1744 ("an employer cannot escape liability by demonstrating that it treats males and females comparably as groups"). The DIP goals were to retain existing women and non-whites in leadership, and to increase percentage of leaders who were women and non-white. Johnson's comments were consistent with these goals, and so was DiBenedetto's elimination.

### ii.   CFO Stephens's E-Mail and the DIP Webcast

Next, AT&T claims CFO Stephens's "More work to do in Finance" email and the October 8, 2020 DIP webcast do not show the company eliminated DiBenedetto because of his race or gender, essentially because neither the email nor the webcast directed managers to terminate white men. (Doc. 4-1, p.18). In so claiming, AT&T ignores most of DiBenedetto's allegations about the DIP, and it patently misrepresents CFO Stephens' email.

DiBenedetto does not allege that Stephens' email and the webcast constitute the sum total of the DIP or capture all its goals and processes. The DIP was a

sweeping, years-long, corporate-wide project to remake the demographics of a massive workforce, especially its leadership ranks, by making them more female and more non-white, and it entailed a slate of operating plans and objectives to which leaders like Johnson and Paul Stephens were held accountable. (Doc.1, ¶41-42, 45, 62, 65, 74-75). The email and webcast show AT&T doubling down on the DIP at the same time it conducted the RIF, and they contain details about the DIP, but these two items are not remotely the whole DIP. (Id.).

As for AT&T pointing out that the email and webcast do not direct the termination of white men, nothing like that is required to withstand a 12(b)(6) motion or even to win at trial. But the email and webcast do support plausible inferences that discrimination caused DiBenedetto's elimination. AT&T told Johnson and Paul Stephens they were personally accountable under the DIP for retaining incumbent women and non-whites in leadership, and for increasing female and non-white leadership demographics. (Doc. 1, ¶41-42, 45, 62, 65, 74-75, Doc. 4-3). Then, AT&T told them to conduct a RIF. Even without an express directive to terminate white men, there is a plausible inference that Johnson and Paul Stephens did what they were told: they conducted the RIF so as to retain women and non-white leaders, and to increase those groups' percentage among the leadership ranks. As shown, the Tax Department RIF furthered those goals by creating a false "Decisional Unit"

comprising three specific white male AVPs while excluding all three women AVPs and eliminating 2/3 of that "unit." *Supra.* It thereby: (1) retained all three women AVPs under Johnson; (2) shifted the AVP gender balance toward parity; and (3) increased the percentage of non-white leaders in the overall company and Finance Department (by decreasing the number of white leaders across finite positions in those larger organizations). Johnson and Paul Stephens' assessment two months earlier that DiBenedetto could not advance because he was a white male demonstrates they were already relying on D&I goals in personnel decisions affecting DiBenedetto, and the department's trend since 2018 of disproportionately hiring and promoting women and non-whites shows broader DIP adherence. Any "injection of race [or gender] into [a] decision-making process yields an unavoidable inference that the employee's race [or gender] impacted the [] determination." *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1346 (11th Cir. 2011).

Finally, AT&T badly misrepresents its CFO's email. CFO Stephens email does not, as AT&T claims, express "mere awareness of its employee demographics." (Doc. 4-1). The email's title is "More work to do in Finance," not "Demographic information about which you should do nothing." The first sentence states, "you saw [CEO] John Stankey's message about our company's race, ethnicity and gender demographics ***and the actions we plan to take to build a more diverse… AT&T.***"

20

(Doc. 4-3, p.2) (emphasis added). After providing the demographic charts, the email states: "Our demographics demonstrate that we **must focus more on … retaining diverse employees … especially at our senior levels**." (Id., p.6) (emphasis added). The next paragraph states the company will "seek to increase diversity." (Id.). The email then references "company-wide accountability" for the demographic initiative (Id.). No reasonable person could read Stephens' email as sharing "mere awareness" of the demographics, and the Court certainly cannot hold on a 12(b)(6) motion that this was Stephens' intent.[9]

The October 8, 2020 webcast stated many of the same things as CFO Stephens' email (Doc. 1, ¶72-75). It, along with the CFO's email, are just two communications in service of the broader DIP. (Doc. 1, ¶¶ 41-42, 45, 62, 65, 74-75). They state, among other things, a preference for women and non-whites and there is, as shown, a plausible inference that this is why AT&T eliminated DiBenedetto. *Latimore*, 2021 U.S. Dist. LEXIS 195094 at *13 (denying motion to dismiss in part based on allegation that a commissioner "expressed a desire … to bring Haitian Americans into the City's 'Executive positions.'").

---

[9] A deposition will provide CFO Stephens the opportunity to explain what he meant by his email, but if he testifies, "this email was merely to share our awareness of our demographics; we are happy with them as they are, and we are not asking anyone to do anything about them," reasonable jurors are likely to believe he is lying.

### iii.     The Finance Department's Hiring and Promotions

AT&T misconstrues DiBenedetto's allegations regarding AT&T's hiring decisions to serve its own means. DiBenedetto's allegations that, beginning in at least 2018, Finance disproportionately hired and promoted women and non-whites are not contradicted by the race and gender makeup of the nine AVPs who reported to Johnson before the RIF. Rather, as CFO Stephens made clear, Finance still had "more work to do" on its demographics, and it is plausible that the higher AVP ranks, containing long term incumbents like DiBenedetto, would take the longest for AT&T to change. This is consistent with Stephens' email, which shows that Finance's non-management (where there is the highest turnover) are only 39% white, while management (lower turnover) is 60% white, and senior leadership (lowest turnover and the focus of Stephens' email) is 86% white. (Doc. 4-3, p.3). A similar trend holds for Finance's gender breakdown: the lower ranks are majority women, and each level of the hierarchy becomes increasingly male. (Id., p.5). The heavily male and white pre-RIF AVP corps under Johnson does not negate DiBenedetto's hiring and promotion allegations; it simply shows AT&T had not *yet* achieved its leadership DIP goals, and it explains why the DIP, Stephens' email, and the webcast (and the RIF) specifically focused on the AVPs.

The Court can also easily dispose of AT&T's claim that DiBenedetto has not pled anecdotes or other facts supporting the hiring and promotion allegations. First, AT&T's contention is false. Johnson expressly told DiBenedetto he would not be promoted because he was a white man. *supra.* This is an anecdote which supports the promotional allegation.

Second, the allegations are sufficiently pled when not improperly read in isolation. Plaintiff's allegations that the Finance Department hired and promoted disproportionately female and non-white employees are: (a) plausibly supported by Plaintiff's own twenty-year experience working in that department; (b) consistent with Johnson telling Plaintiff he could not be promoted in part because he is a white male; and (c) consistent with the DIP. The allegations are not speculative, and they, taken as true and in combination with the rest of the pleadings, support plausible claims. *Buchanan v. Delta Air Lines, Inc.*, 727 Fed. Appx. 639, 641 (11th Cir. 2018) (reversing district court for granting 12(b)(6) motion, in part because allegations that corporate CEO stated preference for younger workers, and that millennials comprised the majority of new hires, stated a plausible claim, even though "[t]aken in isolation, these facts would perhaps be vague…."). *Accord, Piccirillo v. City of Pembroke Pines*, 2016 U.S. Dist. LEXIS 33227, *17-18 (finding that a lack of

specificity regarding the number of assaults or instances of discriminatory conduct was not fatal where "[d]iscovery will bring these specific facts to light.").[10]

## III.   CONCLUSION

DiBenedetto requests the Court deny AT&T's motion in its entirety. If, however, the Court grants some or all of AT&T's motion, DiBenedetto requests he be permitted to file an amended complaint to cure any pleading defects under Fed. R. Civ. Pro 15(a). *Erickson v. Alacrity Servs., LLC*, 2017 U.S. Dist. LEXIS 220676, *6-7 (N.D. Ga. Mar. 31, 2017).

Should the Court deny AT&T's motion, DiBenedetto requests the Court consider the extent to which AT&T took positions contrary to precedent, failed to alert the Court to adverse authority, cited overruled cases, and misrepresented CFO Stephens' email. AT&T's motion is not just a losing motion, it is frivolous. Unfortunately, there are no effective disincentives to employers willing to spend legal fees on such motions to dismiss. AT&T's worst probable outcome is that its motion is denied, in which case, by the time the District Judge rules on AT&T's

---

[10] *Franklin v. Anderson Media*, 2011 U.S. Dist. LEXIS 97875, *7 n.2 (M.D. Fla. Aug. 31, 2011) does nothing for AT&T. The complaint there did not mention most of the defendants, failed to provide any theory of recovery, and failed to identify any harm to the plaintiff. *Id.* at *12-13. The allegation it found unsupported dealt with an estimate of class-wide financial loss pled to secure diversity jurisdiction, information the plaintiff could not plausibly have known. *Id.* at *7.

objections to the R&R, the company will have bought itself at least six months of delay. Plaintiffs faced with such motions can send Rule 11 letters, but this poisons the relationship with the defendant, and the parties must cooperate on many things during the remaining years of litigation. And the Rule 11 process entails briefing and a hearing – i.e., more expense and delay. While Courts can impose sanctions under their own inherent powers, they rarely do. Instead of sanctions, at least at this stage, a published order denying the motion outright and laying bare AT&T's failures of integrity to the Court will, hopefully, be sufficient to do justice.

Respectfully submitted January 18, 2022.

LEGARE, ATTWOOD & WOLFE, LLC

*/s/ Steven E. Wolfe*
Steven E. Wolfe
Georgia Bar No. 142441
Marissa R. Torgerson
Georgia Bar No. 848356

Decatur Town Center Two
125 Clairemont Avenue, Suite 380
Decatur, Georgia 30030
Telephone:  470-823-4000
Facsimile:   470-201-1212
sewolfe@law-llc.com
mrtorgerson@law-llc.com
Counsel for Plaintiff

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | | |
|---|---|---|
| JOSEPH DIBENEDETTO, | ) | CIVIL ACTION |
| | ) | FILE NO. 1:21-cv-04527-MHC-RDC |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| AT&T SERVICES, INC., | ) | |
| | ) | |
| Defendant. | ) | |

**CERTIFICATE OF SERVICE**

I hereby certify that on January 18, 2022, I electronically filed **PLAINTIFF'S RESPONSE TO DEFENDANT AT&T SERVICES, INC'S MOTION TO DISMISS** with the Clerk of Court using the CM/ECF system.  Notice of this filing will be sent to all counsel of record via the Court's CM/ECF filing system:

Yendelela N. Holston
yjholston@kilpatricktownsend.com
Chang (Alice) Yu
ayu@kilpatricktownsend.com
Sheldon W. Snipe
Sheldon.snipe@att.com

LEGARE, ATTWOOD & WOLFE, LLC

By:   */s/ Steven E. Wolfe*
      Steven E. Wolfe
      Georgia Bar No. 142441
      Counsel for Plaintiff

26