**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | | |
|---|---|---|
| JOSEPH DIBENEDETTO, | ) | CIVIL ACTION |
| | ) | FILE NO. |
| Plaintiff | ) | |
| | ) | 1:21-cv-04527-MHC-RDC |
| v. | ) | |
| | ) | |
| AT&T SERVICES, INC., | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |

## BRIEF IN SUPPORT OF DEFENDANT AT&T SERVICES, INC.'S MOTION FOR SUMMARY JUDGMENT

### I.   INTRODUCTION

Plaintiff Joseph DiBenedetto was a then-58-year-old white man whose 60-year-old white male supervisor laid him off after consolidating his position with those of two other white men aged 58 and 71. These three positions—all held by white men—were properly consolidated as the result of a company-wide effort to eliminate inefficiencies and reduce costs within the Tax Department. The white male decisionmaker retained the person best able to handle the consolidated role, who was not Plaintiff. The undisputed material facts do not support Plaintiff's speculative narrative that he was the victim of a corporate scheme to replace white male employees like himself with people of color and women. AT&T respectfully requests that the Court enter summary judgment in its favor on Plaintiff's claims

of race and sex discrimination.[1]

## II. <u>STATEMENT OF FACTS</u>

### A. Plaintiff's AT&T employment.

From 2015 until his surplus in November 2020, Plaintiff worked in Atlanta in the Property Tax group as an AVP of Property Tax Research and Planning. (DiBenedetto Dep. ("Pl.") 34:17-19.) The Property Tax group was part of AT&T's Tax Department, which is in the Finance Department. (Paul Stephens Dep. ("PS") 103:20-22; Declaration of Gary Johnson ("Johnson Dec.") ¶¶ 2,4.) The Tax Department consisted of multiple groups including the Property Tax Group, Transactional Tax Group, External Tax Policy Group, Income Tax Group, and International Tax Group. (Johnson Dec. ¶ 2)

The Property Tax group included four AVPs, all white men. (Pl. 43:13-18; Johnson Dec. ¶ 4.) AVPs Gary Wiggins and Bob Strong (replaced by Gary Hunter in 2018) led the negotiation teams. (Gary Johnson Dep. ("GJ") 154:17-21; Pl. 64:16-18.) Wiggins and Strong/Hunter divided the country by state. (GJ 154:17-21.) Each supervised three to four direct reports. (Pl. 59:22-60:3, 60:23-61:8.) Plaintiff handled tax research and planning in support of negotiations with state governments. (Pl. 45:20-24, 46:11-18, 47:9-21.) A fourth Property Tax AVP, Brian Marler (white male), led an eight-person team responsible for property tax-related compliance, such as

---

[1] AT&T disputes his age discrimination claim and is confident the Company will prevail on it at trial.

filing tax returns and paying tax bills. (GJ 154:6-9.)

AVP Elizabeth Creager (white female) was Plaintiff's supervisor from 2015 until March 2019. (Elizabeth Creager Dep. ("EC") 7:8-24.) During that time, Creager supervised the four Property Tax AVPs as well as External Tax AVP Deborah Bierbaum. (*Id.* 6:10-13; 13:13-20.) When Creager first became his manager, Plaintiff had one direct report: Gary Hunter. (EC 19:15) Hunter joined AT&T in 2012 with significant tax experience, having held a higher position at his prior employer than the level he was brought in at AT&T. (EC 20:10-17.)

In March 2019, the Tax Department reorganized. AT&T promoted Gary Johnson (white male, age 59) to a newly created VP of Tax position. (Johnson Dec. ¶ 2.) Johnson supervised the four Property Tax AVPs, three Transactional Tax AVPs (including Creager) and External Tax AVP Bierbaum. (*Id.* ¶ 4.) At that time, Johnson reported to SVP Paul Stephens (white male), who reported to Chief Financial Officer John Stephens (white male). (GJ 14:4-6, 14:9-12.) All AVPs reporting to Johnson were white; five of the eight were men.[2] (Johnson Dec. ¶ 4.)

**B. Plaintiff refuses to relocate to Dallas headquarters.**

---

[2] In addition to Plaintiff, Hunter, Wiggins, Marler, Creager, and Bierbaum, Johnson supervised two other AVPs: Scott Adams (white male), Transaction Tax Audits, and Liz Bopp (white female), Transaction Tax Billing, Research, & Planning. (Johnson Dec. ¶ 4.) The Transaction Tax team (Creager, Adams, Bopp) was responsible for all operating taxes not involving property, such as sales taxes and use taxes. (*Id.* ¶¶ 6-7.) Bierbaum, the sole AVP in charge of External Tax Policy, was responsible for coordinating with federal and state legislatures about tax policy issues. (*Id.* ¶ 5.)

In 2018-2019, AT&T pushed to have Tax Department leadership work in its Dallas headquarters. (PS 227:13-14; GJ 218:11-15.) Senior leaders particularly wanted Plaintiff's position to be in Dallas where most Tax Department leaders were located. (PS 168:9-14, 227:12-14.) AT&T issued a "Follow the Work" letter to Plaintiff dated August 30, 2019, indicating that Plaintiff must relocate to Dallas by December 2, 2019, or risk being surplused. (Pl. Ex. 5.) Plaintiff signed the "Follow the Work" acknowledgement on September 3, 2019, agreeing to relocate. (*Id.*) As part of the relocation benefits, AT&T offered to purchase Plaintiff's home. (Pl. 176:22-23; GJ 245:4-13.) But, when AT&T's offer, consistent with an appraisal, was less than what Plaintiff wanted for the purchase price, he refused to relocate. (Pl. 55:24-56:3.) He told Johnson "You know, if you need to surplus me, surplus me," adding "we'll just let the chips fall where they may." (*Id.* 55:19-21, 56:4-5.)

**C. Plaintiff fills in for Hunter and Wiggins when they go on leave.**

In August 2019, Hunter went on a seven-week leave of absence. (GJ 143:18-21.) Because Johnson thought Plaintiff had the most bandwidth to pick up additional duties, he assigned Plaintiff to supervise Hunter's team on an interim basis. (*Id.* 146:7-11, 146:18-19, 147:1-2.) A few months after Hunter returned, Wiggins went out for several months and Plaintiff supervised Wiggins' team during that time. (*Id.* 151:23-152:1, 152:15-16.) Given the circumstances, Johnson cancelled Plaintiff's "Follow the Work" letter so that Plaintiff would not be surplused for refusing to move. (*Id.* 365:20-22.)

4

### D. Ongoing issues with Plaintiff's leadership

While Plaintiff's managers had no concerns with the quality of his *individual* work,[3] they had concerns about his *team* work, particularly his leadership as he was confrontational and not considered a "team player." (EC 10:8-10, 12:18-22, 50:4-5; GJ 356:13-16).  For example:

- SVP Stephens' predecessor told Creager that Plaintiff could be inflexible and difficult to work with. (EC 49:12-17.)

- Creager observed that Plaintiff was not collaborative and that coworkers often did not want to work with him. (*Id.* 9:11-16, 10:4-10.) She discussed these traits with SVP Stephens. (*Id.* 48:7-15, 48:19-25, 49:21-50:5.)

- Johnson became aware that certain co-workers in other areas refused to be on conference calls with Plaintiff.[4] (GJ 155:18-21; 354:22-355:2.)

- Marler complained to Johnson that Plaintiff was "confrontational" and made "unreasonable demands." (*Id.* 157:18; Brian Marler Dep. ("BM") 14:14-22, 38:7-8, 39:12, 39:16-19.) Marler told Johnson that members of Wiggins' team had complained about Plaintiff when Plaintiff covered for Wiggins. (GJ 157:13-22, 158:7-9, 160:2-7, 161:23-25.) Marler's own team had multiple negative experiences with Plaintiff. (BM 16:13-25.)

Johnson also had concerns about Plaintiff's supervisory skills. AT&T had hired William Gingrey to assist with property tax research and planning, reporting

---

[3] Creager readily acknowledged that, as expected for anyone at the AVP level, Plaintiff performed satisfactorily. (EC 8:11-14.) She gave him a rating of "Extraordinary Impact" on his 2018 review in acknowledgement that he had closed several of the projects on which he had been working. (EC 18:21-24.)

[4] Marler recalled that when working on a large project with Plaintiff involving the Fixed Asset group, which required cross-group interaction, Plaintiff "damaged our relationship" with the AVP and the Director of Fixed Assets because Plaintiff would often disrupt project calls and was very confrontational. (BM 39:5-17.)

to Plaintiff. (Pl. 83:15-17; GJ 168:11-13.) Plaintiff was dissatisfied with Gingrey's performance and concluded that Gingrey should be fired. (GJ 168:16-169:1.) Johnson, however, believed Plaintiff had not provided Gingrey needed guidance and moved Gingrey under Hunter, where Gingrey excelled. (*Id*. 250:2-4, 350:25-351:19.)

### E. Property Tax conducts a force reduction (surplus).

AT&T consistently seeks to reduce costs for ongoing business health and to return value to shareholders. (Johnson Dec. ¶ 10.) In 2020, the Finance Department, like the rest of AT&T, was under pressure to reduce costs and drive efficiencies. (PS 76:2-8; GJ 202:18-24, 204:4, 204:23-205:1; Ashley Hockenbrough Dep. ("AH") 128:2-5.) Finance considered various options, such as consolidating positions and outsourcing or automating work. (AH 128:17-21, 129:8-9, 143:11-13.) As part of this process, Finance senior leadership was tasked with evaluating whether positions could be combined or eliminated.  (GJ 202:14-24, 204:4, 204:23-205:1.) Many, including Plaintiff, speculated that there would be an upcoming surplus. (Pl. Ex. 22; BM 22:23-23:13.)

Johnson and SVP Stephens discussed whether Johnson could consolidate or eliminate any AVP positions. (GJ 216:23-217:4.) They believed the Transactional Tax and External Policy teams (four of the eight AVPs Johnson supervised) were leanly staffed and not appropriate for force reduction given their workloads. (Johnson Dec. ¶¶ 5, 7, 9, 11; PS 212:6-14.) For example, the Transactional Tax team

6

was responsible for over $10 billion in liabilities, (Johnson Dec. ¶ 7), and had absorbed extra transactional work from the 2018 Warner Media merger, (*Id.* ¶ 9; PS 212:6-14). In contrast, the four Property Tax AVPs were responsible for just under $1 billion in liabilities, and the Warner Media merger did not have the same impact on their workload. (Johnson Dec. ¶¶ 8-9.) Thus, Johnson focused on whether positions in the Property Tax group could be combined. (*Id.* ¶ 11; GJ 216:1-8, 216:23-217:4.)

### AT&T Property Tax Department in September 2020



Because Johnson was still new to the VP role and Marler was the sole AVP experienced in property tax compliance, Johnson believed Marler's property tax compliance role to be essential and did not consider consolidating it. (GJ 217:1-4.) Johnson thus looked at the three AVP positions supporting property tax negotiations, then held by Plaintiff, Wiggins, and Hunter. (*Id.* 217:2-3.) Initially, Johnson felt it did not make sense to have two AVPs over negotiations essentially doing the same job for different states. (*Id.* 215:16-17, 299:25-300:1.) He considered Hunter to be better able than Wiggins to handle the increased responsibilities. (*Id.*

363:25-364:3, 366:19-21.) In fact, some states in Wiggins' territory had already moved to Hunter. (*Id*. 215:17-20.) As a result, Hunter held negotiation responsibility over a greater share of states than Wiggins. (*Id.*)

When Johnson looked at all three Property Tax AVPs, he determined he could consolidate the three AVP roles into one responsible for all three functions: research, planning, and negotiations. (*Id*. 215:7-13, 216:5-8, 216:23-217:4.) SVP Stephens agreed. (PS 222:19-223:4.) Among the three AVPs (Hunter, Plaintiff, and Wiggins), Johnson concluded that Hunter was most capable of handling the combined role, which included managing six direct reports plus indirect reports. (GJ 216:1-3; Johnson Dec. ¶ 12.) Johnson believed Hunter to be the strongest leader in the Property Tax group. (GJ 363:25-364:3.) Beyond successfully leading a negotiations team, Hunter had previous experience in research and planning. (*Id*. 216:1-3.) Hunter collaborated well with others, and Johnson had not received complaints about Hunter as he had about Plaintiff. (*Id*. 363:25-364:3.)

In contrast, Johnson had concerns about Plaintiff's leadership skills. (*Id*. 227:12-21, 350:23-351:8, 368:25-369:1.) Plaintiff failed to see the potential in his direct report, Gingrey, there had been complaints about Plaintiff's management skills when he filled in for Wiggins, and Plaintiff was combative and not considered a team player. (*Id*. 350:23-351:8, 354:20-22, 356:13-16, 363:24-25, Def Ex. 1.) Finally, Johnson noted the combined position would be in Dallas, where

Plaintiff refused to move and Hunter already worked. (GJ 226:17-19.)[5]

By September 2020, Johnson and SVP Stephens were comfortable with the consolidation plan and confident that Hunter was hands-down the best choice to handle the consolidated role. (PS 224:22-225:2, 226:24-227:7; GJ 226:15-23, 227:3-23.)

AT&T typically follows certain procedures, including utilizing an online portal, when determining which employees will be surplused. (AH 109:23-25, Ex. 28.) This process functions as a disciplined way of evaluating the relative skills of those in an affected work group. (AH Ex. 28.) An affected work group can be a few employees or several hundred. (AH 74:13-17.) In the formal surplus process, a business case for the surplus is put into the surplus portal and approved by the business leader (here, Paul Stephens), the affected work group is identified, and the decision-maker rates and ranks employees in the affected work group. (AH Ex. 28 at 934-36.) The number of positions being eliminated is then confirmed, and those employees who rank lowest are surplused.[6] (*Id.* at 935-36.)

 Ashley Hockenbrough, the Human Resources Business Partner for Tax, gave Johnson guidance on the formal surplus process. (GJ 329:1-4.) Wanting to give him as much notice as possible, Johnson told Plaintiff his position would be

---

[5] Seeing opportunity for career advancement by working at AT&T's headquarters, Hunter previously requested a transfer and relocated to Dallas. (PS 47:16-24.)
[6] Each surplus is unique. In some, employees in the affected work group will have the option to volunteer to leave or retire early with severance. (AH 52:19-53:4.) In those situations, the number of volunteers lower the number of employees to be involuntarily surplused. (*Id.* 84:19-85:1; 111:16-24.)

surplused before Johnson completed the online surplus process. (GJ 312:8-9.) Although Johnson notified Plaintiff he would be surplussed early, a manager providing advance notice of an impending surplus, while discouraged, is not uncommon, especially in small affected work groups. (AH 109:2-6, 110:7-12, 111:20-24.) Hockenbrough testified that given the circumstances here—the consolidation of three positions—it was not surprising Johnson had already (1) considered the strengths and weaknesses of the three AVPs and the requirements of the consolidated position, and (2) determined Hunter would be retained. (AH 54:16-55:1, 178:5-9.)

The formal surplus process began on September 23, 2020. (GJ Ex. 26.) After the Business Case was approved and the affected work group entered, Johnson accessed the portal to officially enter the rate and rank of the three AVPs. (GJ Def. Ex. 3; AH 89:16-20.) Consistent with his earlier analysis, Johnson ranked the three AVPs the same on performance, skills, and experience, but assessed Hunter's leadership skills as the highest followed by Wiggins and then Plaintiff. (GJ Def. Ex. 3.) After the process was completed and approved by legal and corporate HR, Plaintiff received the separation paperwork. (AH 180:12-17.) Plaintiff's last day of employment was November 2, 2020. (Pl. Ex. 15.)

### F. Plaintiff's "evidence" of alleged discrimination.

#### 1. Plaintiff asks about potential promotion.

In July 2020, Plaintiff asked Johnson about the likelihood of Plaintiff

succeeding Johnson after he retired. (GJ 225:11-14; Pl. 181:17-20.) At the time, Johnson, who had been promoted 14 months earlier at age 59 (one year older than plaintiff was in July 2020), had no immediate plans to retire and would not get to choose who might fill his role when he did. (GJ 225:23-25, 352:3-6.) Johnson gave Plaintiff his honest opinion of Plaintiff's chances for promotion. (*Id.* 225:17-24.) Johnson pointed out Plaintiff was not in Dallas, telling Plaintiff he would have to move. (GJ Ex. 17.)[7] Johnson also advised Plaintiff to consider the other potential candidates—Hunter, Creager, and Scott. (*Id.*) Johnson opined to Plaintiff that "[w]ith these roles, you know, you've got to be able to adapt and move, and I'm not saying you can't, but a 58-year old white guy, I don't know if that's going to happen." (*Id.)* Plaintiff clandestinely recorded their phone conversation. (Pl 183:22-24.) Johnson testified the recording contained only part of their conversation and that he also discussed his belief that Plaintiff's leadership skills were lacking. (GJ 249:1-2, 249:6-12.) Plaintiff admitted the recording does not contain the entire conversation. (Pl. 182:21-183:3.)

### 2. AT&T's Diversity, Equity and Inclusion Initiatives ("DEI").

Plaintiff has also cited to AT&T's DEI initiatives as evidence of race and sex discrimination. (Doc. 1 ¶¶ 41-48.) AT&T is committed to ensuring that individuals

---

[7] Exhibit 17 to Johnson's declaration is an audio file recording of Johnson and Plaintiff's phone call. Defendants are manually filing a copy of the audio file contemporaneously with its filing.

with diverse backgrounds, races, experiences, and the like are treated equally and given the same opportunities. A significant part of its DEI initiatives is to bring awareness and thoughtfulness to others' differences. (PS 118:24-119:1; EC 28:24-29:4.) The broad company-wide DEI initiative filtered down into the separate departments including the Tax Department. The 2019 Tax Organization Goals stated a goal to "support diversity" throughout the department. (GJ Ex. 15.)

All AT&T managers deposed by Plaintiff—Johnson, SVP Stephens, CFO John Stephens, Creager, and Marler—uniformly testified employment decisions were made based on who was the most qualified, and not because of a candidate's race, sex, age, or other protected characteristic. (PS 166:10-15; John Stephens Dep. ("JS") 63:24-64:3; BM 25:11-15; EC 37:14-20; GJ 95:6-11.) All testified they viewed AT&T's DEI as focusing on awareness and inclusion, especially when dealing with others, and making sure people are treated the same. (PS 126:16-19; EC 31:9-16, 31:18-20; BM: 25:3-8; GJ 91:23-92:2.) All testified they did not feel pressured to increase "diversity" on their teams because they were not measured or compensated based on diversity of their teams. (JS 70:9-14; BM 25:16-21; EC 37:21-38:12; GJ 370:12-371:19; Joel Lang 30(b)(6) Dep. ("JL") 69:7-22, 69:25-70:14, 70:15-71:7, 71:8-20, 71:21-72:14.)

AT&T's DEI initiatives did not establish a quota system or mandate the firing of non-diverse employees to satisfy overarching DEI goals. (GJ Ex. 15-16, 20, 29.) Some managers testified that they paid little attention to emails discussing

DEI. (EC 35:9-10; BM 32:18-20.) None believed that AT&T's diversity initiatives included a plan to terminate white men to create a workforce with more women and minorities. (GJ 370:21-371:17.) And, as Plaintiff admitted, none of the DEI communications told recipients that they had to hire, promote, or terminate any specific demographic of people. (Pl. 81:17-21.)

## III.   ARGUMENT AND CITATION OF AUTHORITY

Summary judgment should be granted if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). There is no genuine dispute of material fact when there is not enough evidence favoring the nonmoving party for a reasonable jury to return a verdict in his favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). The non-moving party may not rest on mere allegations or denials, but rather must "go beyond the pleadings" and "designate specific facts showing that there is a genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).

Plaintiff asserts claims of race and sex discrimination under Title VII and race discrimination under Section 1981. Under Title VII, Plaintiff must show that race or sex was a motivating factor for his termination. 42 U.S.C. § 2000e-2(m). Under Section 1981, Plaintiff must show that "but for" his race, his employment would not have been terminated. *Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*, 140 S. Ct. 1009, 1019 (2020). The undisputed material facts do not support Plaintiff's claims under either standard.

Under Title VII and Section 1981, "a plaintiff may prove . . . discrimination through either direct or [circumstantial] evidence." *Chapter 7 Tr. v. Gate Gourmet, Inc.*, 683 F.3d 1249, 1257 (11th Cir. 2012); *Anderson v. Dunbar Armored, Inc.*, 678 F. Supp. 2d 1280, 1302 (N.D. Ga. 2009). Plaintiff's claims fail under both methods.

**A.    Plaintiff has no direct evidence of discrimination.**

"Direct evidence is evidence, that, if believed, proves the existence of discriminatory intent without inference or presumption." *Jefferson v. Sewon Am., Inc.*, 891 F.3d 911, 921 (11th Cir. 2018). "To be direct evidence, the remark must indicate that the employment decision in question was motivated by race [or gender]." *Scott v. Suncoast Beverage Sales, Ltd.*, 295 F.3d 1223, 1227–28 (11th Cir. 2002). The Eleventh Circuit has explained that "'only the most blatant remarks, whose intent could be nothing other than to discriminate on the protected classification' are direct evidence of discrimination." *Id.* at 1227. "Evidence that only suggests discrimination . . . or that is subject to more than one interpretation, . . . does not constitute direct evidence." *Merritt v. Dillard Paper Co.*, 120 F.3d 1181, 1189 (11th Cir. 1997). Plaintiff has no direct evidence.

Plaintiff's allegations are based primarily on one comment Johnson made during a conversation about a hypothetical promotion. When Plaintiff asked if he might be considered for such a promotion, Johnson replied that Plaintiff would have "to be able to adapt and move, and I'm not saying you can't, but a 58-year-old white guy, I don't know if that's going to happen." This is not direct evidence

14

of discrimination for at least two reasons. First, Johnson's remark was not made in the context of the surplus decision. It was made months earlier during a conversation about whether Plaintiff could theoretically be Johnson's successor. It is well established that "remarks unrelated to the decision-making process itself are not direct evidence of discrimination." *Morgan v. Kalka & Baer LLC*, 750 F. App'x 784, 787 (11th Cir. 2018) (quoting *Standard v. A.B.E.L. Servs., Inc.*, 161 F.3d 1318, 1330 (11th Cir. 1998)).

Second, it is not the type of blatant remark that the Eleventh Circuit has found to be direct evidence of discriminatory intent. *See, e.g., Early v. Champion Int'l Corp.*, 907 F.2d 1077, 1081 (11th Cir. 1990) ("One example of direct evidence would be a management memorandum saying, 'Fire Early—he is too old.'"); *Schweers v. Best Buy, Inc.*, 132 F. App'x 322, 324 (11th Cir. 2005) ("[Direct evidence would include] a frank admission from a manager that he refused to hire an applicant because he was black.").[8] Here, it would require multiple inferential leaps from Johnson's statement about a theoretical promotion to the conclusion that Johnson—a white man—selected Plaintiff—a white man—for surplus (instead of

---

[8] *See also Roberts v. Design & Mfg. Servs., Inc.*, 167 F. App'x 82, 84-85 (11th Cir. 2006) (Company president's statements that an employee "was getting too old for this stuff" not direct evidence of age discrimination.); *Barnes v. Southwest Forest Indus., Inc.*, 814 F.2d 607, 610-11 (11th Cir. 1987) (Supervisor's comment that employee "'would have to take another physical examination and at your age, I don't believe you could pass it,' although it may have been inappropriate and condescending, is not the sort of evidence that this Circuit has recognized as being direct evidence of discrimination").

another white man) due to Plaintiff's race or sex.

Moreover, even if Johnson's statement constituted direct evidence of discriminatory intent, Plaintiff would still have to prove that his race was the *but-for* cause of his termination under Section 1981, which he cannot do. *See Comcast*, 140 S. Ct. at 1019 (holding that Section 1981 claims require a heightened but-for causation); *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 175-76 (2009) (explaining that for age claims, which also require but-for causation, "[a] plaintiff must prove by a preponderance of the evidence (which may be direct or circumstantial), that age was the "but-for" cause of the challenged employer decision").[9] Nothing in Johnson's statement indicates that Plaintiff's race was the but-for cause of the ultimate surplus decision. Indeed, the rest of Johnson's statement, including his concerns about Plaintiff's lack of leadership, conveniently was not preserved by Plaintiff. In the end, this is a red herring as Johnson's statement was not tied to the surplus decision.

### B. Plaintiff cannot establish circumstantial evidence of race discrimination.

When, as here, a plaintiff lacks direct evidence of discrimination, courts

---

[9] The Supreme Court's decision in *Gross* concerns an ADEA claim, which requires the same heightened but-for causation standard as claims brought under Section 1981. *See Comcast*, 140 S. Ct. at 1014-15 (noting that the phrase "because of" in the ADEA "indicate[s] a but-for causation requirement" and holding that "[t]his ancient and simply 'but for' common law causation test" is the same one applicable in the Section 1981 context).

analyze discrimination claims under the *McDonnell Douglas* burden-shifting framework. *Alvarez v. Royal Atl. Devs., Inc.*, 610 F.3d 1253, 1264 (11th Cir. 2010). The plaintiff must first establish a prima facie case of discrimination by showing that "he was a qualified member of a protected class and was subjected to an adverse employment action in contrast to similarly situated employees outside the protected class." *Id.* If he does so, the burden shifts to the defendant to articulate a legitimate non-discriminatory reason for the adverse action. *Id.* The burden then shifts back to the plaintiff to produce evidence the proffered reasons are pretext and that discrimination is in fact the real reason for the decision. *Id.*

### 1. Plaintiff cannot state a prima facie case of race discrimination.

Plaintiff cannot establish a prima facie case of race discrimination. No similarly situated non-white employees were treated more favorably than him. *See McQueen v. Wells Fargo*, 573 F. App'x 836, 838 (11th Cir. 2014) (affirming summary judgment to employer because employee "did not submit any evidence that she was replaced by, or treated less favorably than, a similarly situated employee outside of her protected class"). In fact, there were no similarly situated non-white employees at all. AT&T consolidated three AVP positions into one, and Johnson, a white male, chose among three white males to retain one. Plaintiff's inability to identify any similarly situated minority comparators is fatal to his race claim. *See Alvarez*, 610 F.3d at 1264.

### 2. Plaintiff has no evidence that AT&T's legitimate

17

**nondiscriminatory reason for his termination was a pretext for race discrimination.**

Even if Plaintiff could state a prima facie case of discrimination, AT&T easily meets its burden of articulating a legitimate, non-discriminatory reason for his termination: the consolidation of AVP roles under Johnson was part of AT&T's efforts to reduce costs and increase efficiencies in the Tax Department, and AT&T chose to retain the strongest AVP. (Johnson Dec. ¶¶ 10-12; PS 76:2-8; AH 128:2-5.) The elimination of positions in a force reduction is a legitimate, non-discriminatory reason for termination. *See, e.g.*, *Sims v. MVM, Inc.*, 704 F.3d 1327, 1334 (11th Cir. 2013) (force reduction based on budget constraints forcing elimination of two supervisor positions is a legitimate, non-discriminatory reason for termination.); *Tidwell v. Carter Products*, 135 F.3d 1422, 1426 (11th Cir. 1998) ("[Employer successfully] proffered its [force reduction] as a legitimate, non-discriminatory reason for terminating [plaintiff].")

To avoid summary judgment, Plaintiff must show that AT&T's reason was pretextual. *Rojas v. Florida*, 285 F.3d 1339, 1342 (11th Cir. 2002). In analyzing whether a plaintiff can show pretext, the Eleventh Circuit has held "we must be careful not to allow Title VII plaintiffs simply to litigate whether they are, in fact, good employees. 'We are not in the business of adjudging whether employment decisions are prudent or fair. Instead, our sole concern is whether unlawful discriminatory animus motivates a challenged employment decision.'" *Id.*

(citations omitted). The inquiry into pretext "centers on the employer's beliefs, not the employee's beliefs and, to be blunt about it, not on reality as it exists outside of the decision maker's head." *Alvarez*, 610 F.3d at 1266.

Because Plaintiff bears the burden of establishing pretext, he must present "'significantly probative' evidence" to defeat summary judgment. *Young v. Gen. Foods Corp.*, 840 F.2d 825, 829 (11th Cir. 1988) (citations omitted). There is no such evidence here. Plaintiff questions whether the surplus was in fact motivated by a desire to reduce costs, pointing to AT&T's "solid" performance in the third quarter of 2020. (Doc. 1 ¶ 77.) Yet, the mere fact that AT&T had a "solid" performance in one quarter does not support an inference that the Company was not seeking to perform even better by reducing costs and driving efficiencies through consolidating and eliminating positions.

Unable or unwilling to confront the undisputed facts, Plaintiff instead advances a conspiracy theory that his termination was the result of AT&T's DEI initiatives which, according to him, sought to "make sure that the workforce was well diversified and not so heavily . . . one race over another." (Pl. 75:18-21.) This is pure fiction.

Plaintiff concedes that Johnson alone was responsible for the decision to surplus him, (Doc. 86 at 2), thus the only thing that matters regarding AT&T's DEI initiatives is whether those initiatives wrongly influenced Johnson's decision. *Johnson v. Gestamp Al., LLC*, 946 F. Supp. 2d 1180, 1199 (N.D. Ala. 2013) ("When

determining whether an employer's proffered reason for terminating the employee was pretextual, it is the motive of the decisionmaker . . . in discharging the employee that is at issue."). But Plaintiff has no evidence supporting a conclusion that Johnson was motivated by any DEI initiative.  No such evidence exists, of course, because Plaintiffs theory is nonsensical:  his responsibilities were assumed by another 58-year-old white man, thus Johnson's decision did nothing to alter diversity. Undeterred, Plaintiff points to Johnson's out-of-context statement concerning Plaintiffs' hypothetical promotability and various announcements by AT&T about its DEI initiatives as "evidence" that AT&T sought to get rid of white men because it was "hyper focused" on creating a more demographically balanced workforce. (Pl. 125:2-8.)

At the outset, the Court should reject Plaintiff's theory because it is untethered to the undisputed facts: (1) Plaintiff's surplus did not increase the number of non-white AVPs reporting to Johnson—both before and after the surplus, there were none; (2) Johnson and others consistently testified that they did not feel pressured to diversify their teams; and (3) Johnson made no effort to diversify his team as Plaintiff's duties were assumed by a white man.

Moreover, no DEI initiatives or communications contain any indicia of hostility towards white or male employees. For example, the email entitled "More Work to do in Finance," simply states that the Finance Department must "focus more on attracting and retaining diverse employees" and "will explore

20

opportunities to further infuse diversity and inclusion" in the workplace. (GJ Ex. 20.) It does not state—and there is no evidence otherwise—that it was intended or interpreted as an intention by AT&T to terminate white male employees to fulfill its DEI goals. (*Id.*) Indeed, it is well established that the mere existence of DEI initiatives in the workforce does not give rise to a discrimination claim under Title VII because such efforts are permitted and promote the statute's underlying purpose. *See United Steelworkers of Am., AFL-CIO-CLC v. Weber*, 443 U.S. 193, 208 (1979) (Title VII does not prohibit private, voluntary efforts to "abolish traditional patterns" of segregation and hierarchy). The mere presence of DEI initiatives is insufficient to establish that Johnson was motivated by discriminatory reasons during the surplus process. *Johnson*, 946 F. Supp. 2d at 1199.

Finally, the fact that the formal entries into the surplus portal occurred after Johnson told Plaintiff he was being surplused is immaterial. Johnson arguably jumped the gun in telling Plaintiff of the surplus decision, but that does not suggest any discriminatory motivation. After all, all three candidates were white men, so a white male would have been chosen whenever the surplus portal was used. Moreover, it defies commonsense to suggest, as Plaintiff would ask the Court to believe, that Johnson needed to wait until after he had input his assessment of the three AVPs into a portal to see who came out on top. Any supervisor who did not know, or had not previously considered, the comparative skills, performance, and leadership strengths of three candidates before entering

ratings into a portal would be failing at his job.

### C. Plaintiff has no evidence to establish that his race was the but-for cause of his termination as required under Section 1981.

Plaintiff's race claim under Section 1981 fails just like his Title VII race claim. To succeed on a Section 1981 claim, "a plaintiff must . . . prove that, but for race, [he] would not have suffered the loss of a legally protected right." *See Comcast*, 140 S. Ct. at 1019 (declining to extend the more lenient motivating factor test under Title VII to cases brought under § 1981). Plaintiff cannot meet the heightened "but-for" causation standard required by Section 1981. There is no evidence that the three AVP positions were consolidated into one because of Plaintiff's race, or that Hunter was retained over Plaintiff due to race. Further, as Plaintiff alleges that his sex and age also factored into his termination, he is effectively conceding that race was not the but-for cause of his termination. *See*, *e.g.*, *Gross*, 557 U.S. at 175-76 (explaining that but-for causation requires a single cause and does not permit mixed-motive claims). Accordingly, AT&T is entitled to summary judgment on Plaintiff's race discrimination claims.

### D. Plaintiff has no circumstantial evidence of sex discrimination.

#### 1. Plaintiff cannot state a prima facie case of sex discrimination.

Plaintiff's sex discrimination claim meets the same fatal fate as his race claims—he cannot state a prima facie case because the two AVP comparators in the surplus were both men. Plaintiff suggests that Johnson targeted the Property

AVP positions for consolidation because they were men, seeking to increase the male/female ratio of his AVP direct reports. (Doc. 1 ¶¶ 46-48, 84-86.) Yet, Plaintiff has no evidence supporting this speculation. The three female and two male AVPs in the Transactional and External Tax roles were not similarly situated to Plaintiff. They had different responsibilities that were more critical to the business. (Johnson Dec. ¶¶ 5-7, 9, 11.) Given the differences in their roles, no female AVPs were similarly situated to Plaintiff. *See Rioux v. City of Atlanta, Ga.*, 520 F.3d 1269, 1280 (11th Cir. 2008) ("A comparator is an employee similarly situated to the plaintiff in all relevant respects."). There is no evidence that Johnson considered this other team "off the table" because three of the members were women. This team was off the table because he knew these positions were vital and the incumbents were already stretched thin. (Johnson Dec. ¶¶ 5, 7, 9, 11; PS 212:6-14.)

2. **Plaintiff cannot show that AT&T's legitimate nondiscriminatory reason for selecting him for surplus was a pretext for sex discrimination.**

Even if Plaintiff could state a prima facie case of sex discrimination (and he cannot), the undisputed material facts do not support finding that AT&T's legitimate nondiscriminatory reason was a pretext for discrimination. The decision to consolidate Property Tax AVP positions was based on the needs of the business. (Johnson Dec. ¶ 10; PS 76:2-8; AH 128:2-5.) Four Property Tax AVPs were responsible for just under $1 billion in liabilities, while four Transactional Tax AVPs were responsible for over $10 billion in liabilities. (Johnson Dec ¶¶ 7-8.) The

Transactional Tax AVPs were already stretched thin and took on more work with the Warner Media merger. (*Id.* ¶ 9.) External Tax Policy AVP Deborah Bierbaum had significant expertise leading a team and was the sole AVP responsible for tax policy for the entire department so surplusing her was similarly not an option. (*Id.* ¶¶ 5, 11.) Plaintiff has no evidence that would show the decision to surplus Property Tax AVPs was a pretext for sex discrimination.

Second, if Plaintiff is suggesting that Johnson should have moved Plaintiff into one of the AVP positions held by a female, that argument falls flat. Plaintiff did not have expertise in Transactional or External Policy Tax; his entire employment at AT&T was spent in Property Tax. (Pl. 50:20-22, 51:23-25.) Further, the other AVPs managed others (Johnson Dec. ¶¶ 5-6.) and Plaintiff's demonstrated record of poor interpersonal and management skills weighed against any role for him managing employees, including the consolidated Property Tax position that remained. (GJ 227:12-21, 350:23-351:8, 354:20-22, 356:13-16, 363:24-25, 368:25-369:1.) Third, Plaintiff's conspiracy theory about being pushed out to make room for women as part of AT&T's DEI initiative is based on pure conjecture. Plaintiff claims that from August 2018 through August 2020, disproportionately more women than men were hired. (Pl. 95:1-15, 96:1-11.) However, Plaintiff concedes that he has no knowledge of the demographic makeup of the labor pool and specifically had no knowledge of the percentage of men and women who applied to each position. (Pl. 99:24-100:3, 105:13-16.) He also

acknowledged an equal number of men and women were promoted to AVP in the Tax Department during that same time period. (Pl. 111:19-23.)

Although Plaintiff may believe that the decision to eliminate his position was not the right call, he has no evidence to suggest that unlawful discriminatory animus based on sex motivated the decision. *See Rojas*, 285 F.3d at 1342 ("'We are not in the business of adjudging whether employment decisions are prudent or fair . . . our sole concern is whether unlawful discriminatory animus motivates a challenged employment decision.'") (citation omitted). AT&T is entitled to summary judgment on Plaintiff's claim of sex discrimination.

## IV.   <u>CONCLUSION</u>

Three AVP positions—all held by white men—were properly consolidated as the result of a company-wide effort to eliminate inefficiencies and reduce costs within the Tax Department. The white male decisionmaker retained the AVP best able to handle the consolidated role, who was not Plaintiff. The undisputed material facts do not support Plaintiff's outlandish and speculative narrative that he was the victim of a corporate scheme to replace white male employees like himself with people of color and women. AT&T respectfully requests that the Court enter summary judgment in its favor on Plaintiff's claims of race and sex discrimination.

Respectfully submitted, this 27th day of September 2023.

*/s/ Susan W. Pangborn*

25

Susan W. Pangborn
Georgia Bar No. 735027
KILPATRICK TOWNSEND & STOCKTON
LLP
Suite 2800, 1100 Peachtree Street
Atlanta, GA  30309-4528
Telephone: (404) 815-6500
Facsimile: (404) 815-6555
spangborn@kilpatricktownsend.com

Sheldon W. Snipe
Georgia Bar No. 665790
AT&T SERVICES, INC.
754 Peachtree St., Suite C764
Atlanta, GA 30308
Telephone: (404) 277-7505
sheldon.snipe@att.com
*Counsel for Defendant AT&T Services, Inc.*

<u>LOCAL RULE 5.1(C) CERTIFICATE OF COMPLIANCE</u>

I hereby certify that the foregoing pleading filed with the Clerk of Court has been prepared in 13-point Book Antigua font in accordance with LR 5.1(C). NDGa.

This 27th day of September, 2023.


<u>*/s/ Susan W. Pangborn*</u>
Susan W. Pangborn

## CERTIFICATE OF SERVICE

I hereby certify that on September 27, 2023, I served a copy of the foregoing **BRIEF IN SUPPORT OF DEFENDANT AT&T SERVICES, INC.'S MOTION FOR SUMMARY JUDGMENT** on counsel of record through the Court's CM/ECF system, which will notify all counsel of record as follows:

> LEGARE, ATTWOOD & WOLFE, LLC
> Steven E. Wolfe
> Marissa R. Torgerson
> 125 Clairemont Avenue, Suite 380
> Decatur, GA 30030
> sewolfe@law-llc.com
> mrtorgerson@law-llc.com

> */s/ Susan W. Pangborn*
> Susan W. Pangborn
>
> *Counsel for Defendant*